Saro **DAGHLIAN** on behalf of himself and all others similarly situated, Plaintiff,

v.

**DeVRY UNIVERSITY, INC., DeVry Inc., and Does 1 through and including 100, Defendants.**

No. CV06-00994MMM(PJWx).

United States District Court, C.D. California.

July 20, 2006.

Janet Lindner Spielberg, Janet L. Spielberg Law Offices, Michael D. Braun, Braun Law Group, Los Angeles, CA, for Plaintiff.

Amir Shlesinger, Felicia Yu, Van T. Lam, Reed Smith, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

MORROW, District Judge.

On December 23, 2005, Saro Daghlian commenced this putative class action against DeVry University, Inc., DeVry Inc., and Does 1 through 100 (collectively, "DeVry" or "defendants") in state court. Daghlian alleges that defendants failed to inform students, including him, that academic units earned at DeVry probably would not transfer to other educational institutions, and that students who sought further education elsewhere would have to earn the units anew.

Daghlian filed a first amended complaint on January 11, 2006, which asserted four causes of action: (1) violations of the California Education Code; (2) violations of the California Consumer Legal Remedies Act; (3) false advertising in violation of California Business & Professions Code §§ 17500 et seq.; and (4) unlawful, unfair, and deceptive business practices in violation of California Business & Professions Code §§ 17200 et seq. Defendants removed the action to federal court on February 17, 2006. They now move to dismiss all causes of action in plaintiff's first amended complaint.

## I. FACTUAL BACKGROUND

The first amended complaint contains the following factual allegations, which are accepted as true for purposes of this motion:

Defendant DeVry University provides career-oriented undergraduate and graduate degree programs in technology, business, and management.[1] In addition to an online program, it offers courses at seventy-five locations, including nine campuses in California.[2] Defendant DeVry Inc. is one of the largest publicly held for-profit higher education companies in North America.[3] It is the holding company for

---

1. First Amended Complaint, ¶ 5.

2. Id.

3. Id., ¶ 6.

DeVry University and a number of other educational institutions.[4]

Plaintiff Saro Daghlian was a student at DeVry University from April 2002 until October 2005, attending the Electronics Computer Technology program at the West Hills Campus.[5] Prior to enrolling, Daghlian met with a DeVry recruiter, who represented that DeVry was an accredited college where students were able to obtain degrees. The recruiter told Daghlian that unlike technical colleges that give students certificates that cannot be used towards advanced degrees, academic credits from DeVry were transferrable to a wide variety of other academic institutions.[6] The recruiter did not give Daghlian any documents explaining that DeVry credits were not likely to be accepted by other colleges, and that he would have to start his education over if he chose to attend another college.[7] In reliance on DeVry's representations, Daghlian signed an enrollment agreement in the presence of the recruiter.[8] He has since incurred approximately $40,000.00 of educational debt.[9]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. FED.R.CIV.PROC. 12(b)(6). A court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir.1989). For this reason, a court should not dismiss a complaint if it states a claim under any legal theory, even if a plaintiff erroneously relies on a different theory. *Haddock v. Bd. of Dental Examiners*, 777 F.2d 462, 464 (9th Cir.1985). In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988).

In deciding a motion to dismiss for failure to state a claim, the court's review is generally limited to the contents of the complaint. See *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir.1996); *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir.1995). The court may also consider material that is properly submitted as part of the complaint or that is a proper subject of judicial notice under Rule 201 of the Federal Rules of Evidence. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003); *Gumataotao v. Director of Dept. of Revenue and Taxation*, 236 F.3d 1077, 1083 (9th Cir.2001); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). The court must accept plaintiff's factual allegations as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995). It need not, however, accept as true legal conclusions cast in the

---

4. *Id.*

5. *Id.*, ¶ 4.

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.*

form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

## B. First Cause Of Action Alleging Education Code Violations

Daghlian's first cause of action alleges that defendants failed to comply with various provisions of the Private Postsecondary and Vocational Education Reform Act of 1989 (the "Reform Act"), which is part of the California Education Code. Daghlian contends that defendants violated Education Code § 94816(b) by failing to provide written notification to students that credits earned at DeVry would probably not transfer to other colleges or universities.[10] He also asserts that, as part of their recruiting effort, defendants actively misled students to believe that the credits *would* transfer to other institutions,[11] in violation of Education Code § 94832.[12] Finally, Daghlian alleges that defendants breached Education Code § 94814, which requires that institutions give students and other interested persons, prior to enrollment, a brochure or catalogue that sets forth all material facts that are reasonably likely to affect their decision to enroll.[13]

### 1. Whether Plaintiff Has A Private Right Of Action To Sue For Violation Of Education Code §§ 94814, 94816, And 94832

Defendants argue that Daghlian lacks standing to enforce Education Code §§ 94814, 94816, and 94832, because these sections are not listed in § 94985(b), the Reform Act provision that confers a private right of action to sue for violations of

specific sections of the act.[14] Defendants contend that in amending § 94985, the California Legislature "expressly chose to exclude a private right of action as a remedy for violations of Sections 94814, 94816, and 94832," and therefore that Daghlian's first cause of action must be dismissed.[15]

Daghlian disputes this, focusing on § 94985(b)(6). That section states:

"Notwithstanding any provision of the contract or agreement, a student may bring an action for a violation of this article or for an institution's failure to perform its legal obligations and, upon prevailing thereon, is entitled to the recovery of damages, equitable relief, or any other relief authorized by this article, and reasonable attorney's fees and costs." CAL. EDUC. CODE § 94985(b)(6).

Based on the legislative history of § 94985, the purpose of the Reform Act and subsequent amendments, Daghlian contends that this provision should have been subdivision (c), and that its placement under subdivision (b) was a legislative drafting error. He asks that the court overlook this "blatant" error, and find that he has a private right of action to sue under Education Code §§ 94814, 94816, and 94832.

### a. Principles Of Statutory Construction

■ The parties have not cited, nor has the court found, any case that directly addresses the question presented here. To resolve the issue, therefore, the court must interpret the pertinent provisions of the Reform Act, following California's rules of statutory construction. See *In re*

---

**10.** *Id.,* ¶¶ 11, 12, 26, 27.

**11.** First Amended Complaint, ¶¶ 10, 13.

**12.** *Id.,* ¶¶ 24, 27.

**13.** *Id.,* ¶¶ 25, 27.

**14.** Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss First Amended Complaint ("Defs.' Mot.") at 5–7.

**15.** *Id.* at 6–7.

*First T.D. & Inv., Inc.,* 253 F.3d 520, 527 (9th Cir.2001) ("With the exception of the bankruptcy and district courts below, no state or federal court has had occasion to interpret [Cal. Prof. & Bus.Code] § 10233.2. We therefore apply California's rules of statutory construction," citing *Fed. Sav. & Loan Ins. Corp. v. Butler,* 904 F.2d 505, 510 (9th Cir.1990) (applying California's rules of statutory construction to interpret California Civil Code § 877)); *In re Anderson,* 824 F.2d 754, 756 (9th Cir. 1987) ("We can find no relevant California cases which discuss the problems raised in this appeal. We are bound by California rules of construction in our independent interpretation of the California statutes at issue, however"). See also *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986) ("Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it").

 Under California law, "the 'ultimate task' in statutory interpretation 'is to ascertain the legislature's intent.'" *In re First T.D. & Inv.,* 253 F.3d at 527 (quoting *People v. Massie,* 19 Cal.4th 550, 569, 79 Cal.Rptr.2d 816, 967 P.2d 29 (1998), cert. denied, 526 U.S. 1113, 119 S.Ct. 1759, 143 L.Ed.2d 790 (1999)). See also *S.D. Myers, Inc. v. City and County of San Francisco,* 336 F.3d 1174, 1179 (9th Cir.2003) ("'Of primary importance the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law,'" quoting *San Diego Union v. City Council,* 146 Cal.App.3d 947, 953–54, 196 Cal.Rptr. 45 (1983) (internal citation and quotation marks omitted)); *Cal. Teachers Ass'n v. San Diego Community College Dist.,* 28 Cal.3d 692, 697, 170 Cal.Rptr. 817, 621 P.2d 856 (1981) ("In construing a statute 'we begin with the fundamental rule that a court should ascertain the intent of the Legislature so as to effectuate the purpose

of the law'" (citations and internal quotation marks omitted)).

 Generally, "'the words of the statute provide the most reliable indication of legislative intent.'" *In re First T.D. & Inv.,* 253 F.3d at 527 (quoting *Pacific Gas & Elec. Co. v. County of Stanislaus,* 16 Cal.4th 1143, 1152, 69 Cal.Rptr.2d 329, 947 P.2d 291 (1997)). In interpreting the words of a statute, a court "should give the language ... 'its usual, ordinary import and accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.'" *Id.* (quoting *Dyna–Med, Inc. v. Fair Employment & Hous. Comm'n,* 43 Cal.3d 1379, 1386–87, 241 Cal.Rptr. 67, 743 P.2d 1323 (1987)). See also *Mutual Life Ins. Co. of New York v. City of Los Angeles,* 50 Cal.3d 402, 407, 267 Cal.Rptr. 589, 787 P.2d 996 (1990) ("'[I]n arriving at the meaning of a [[statutory or] constitutional provision], consideration must be given to the words employed, giving to every word, clause and sentence their ordinary meaning,'" quoting *State Board of Educ. v. Levit,* 52 Cal.2d 441, 462, 343 P.2d 8 (1959)); *Cal. Teachers Ass'n,* 28 Cal.3d at 697, 170 Cal. Rptr. 817, 621 P.2d 856 ("An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them" (citations and internal quotations omitted)). ("[W]here the language of a statute is reasonably susceptible of two constructions, one of which in application will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted." *Pitney–Bowes, Inc. v. State of Cal.,* 108 Cal.App.3d 307, 313–14, 166 Cal. Rptr. 489 (1980) (citations and internal quotations omitted)).

█ If the meaning of a statutory provision is ambiguous, "a court may consider extrinsic evidence of the legislature's intent, 'including the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality.'" *In re First T.D. & Inv.*, 253 F.3d at 527 (quoting *Hughes v. Bd. of Architectural Exam'rs*, 17 Cal.4th 763, 776, 72 Cal.Rptr.2d 624, 952 P.2d 641 (1998)). If, on the other hand, "the language of the statute is clear and unambiguous, the statutory analysis ends." *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 490 (9th Cir.1996) (citing *Delaney v. Superior Court*, 50 Cal.3d 785, 800, 268 Cal.Rptr. 753, 789 P.2d 934 (1990)) ("When statutory language is thus clear and unambiguous there is no need for construction, and courts *should not indulge in it*" (internal citations omitted, emphasis original)). See also *Mutual Life Ins. Co.*, 50 Cal.3d at 407, 267 Cal.Rptr. 589, 787 P.2d 996 ("If doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid.... When, however, 'the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature...'" (citations omitted)).

█ This "'plain meaning' rule does not, [however,] prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute." *Lungren v. Deukmejian*, 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299 (1988). The meaning of a statute should be construed in context, and the various parts of the statutory enactment should be harmonized to the extent possible. *Id.;* see *Moyer v. Workmen's Comp. Appeals Bd.*, 10 Cal.3d 222, 230, 110 Cal. Rptr. 144, 514 P.2d 1224 (1973) ("When

used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear. Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole" (citations and internal quotation marks omitted)). Indeed, "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute." *Lungren*, 45 Cal.3d at 735, 248 Cal.Rptr. 115, 755 P.2d 299.

With these principles in mind, the court turns to the language of the statute.

#### b. The Reform Act

In enacting the Reform Act, the California legislature sought "to promote the effective integration of private postsecondary education into all aspects of California's educational system and to foster and improve the educational programs and services of these institutions while protecting the citizens of the state from fraudulent or substandard operations." Cal. Educ. Code § 94705. It also intended "to provide for the protection, education, welfare of citizens of California, its postsecondary education institutions, and its students by providing for all of the following:

(a) Ensuring minimum standards of instructional quality and institutional stability for all students in all types of institutions and thereby encouraging the recognition by public and private institutions of completed coursework and degrees and diplomas issued by private institutions, to the end that students will be provided equal opportunities for equal accomplishment and ability.

(b) Establishing minimum standards concerning the quality of education,

ethical and business practices, health and safety, and fiscal responsibility to provide protection against substandard, transient, unethical, deceptive, or fraudulent institutions and practices.

. . .

(d) Prohibiting misleading literature, advertising, solicitation, or representations by private educational institutions or their agents.

. . .

(f) Protecting the consumer and students against fraud, misrepresentation, or other practices that may lead to an improper loss of funds paid for educational costs, whether financed through personal resources or state and federal student financial aid.

. . .

(h) Recognizing and encouraging quality nongovernmental accreditation, while not ceding to that or any other nongovernmental process the responsibility for state oversight for purposes of approval, if the accreditation process fails either to protect minimum standards of quality or to acknowledge legitimate innovative methods in postsecondary education. . . ." *Id.*

The Reform Act defines "private postsecondary education institutions" as "any person doing business in California that offers to provide or provides, for a tuition, fee, or other charge, any instruction, training, or education" under certain specified circumstances. *Id.*, § 94739(a).[16] The Act creates a Bureau for Private Postsecondary and Vocational Education (the "Bureau")

in the Department of Consumer Affairs, which is charged with the duty of "approving and regulating private postsecondary educational institutions." *Id.*, § 94770. See also *id.*, § 94774 (detailing the Bureau's functions and responsibilities).

The Reform Act is codified in the Education Code, Title 3, Division 10, Part 59, Chapter 7. Article 6, which encompasses Education Code §§ 94800 through 94848, is titled "General Standards for All Postsecondary Institutions Approved Under This Chapter." Section 94800 requires that all institutions comply with certain minimum standards—specifically, that they remain financially capable of fulfilling commitments to students; that they award students appropriate degrees, diplomas, or certificates upon satisfactory completion of training; and that they provide instruction as part of their educational program. *Id.*, § 94800.[17]

Section 94814 mandates that institutions "provide to students and other interested persons, prior to enrollment, a catalog[ue] or brochure containing . . . all . . . material facts concerning the institution and the program or course of instruction that are reasonably likely to affect the decision of the student to enroll, as prescribed by rules and regulations adopted by the [Bureau]." *Id.*, § 94814(a). Failure to disclose this information renders a written contract between the institution and a student unenforceable. *Id.*, § 94814(b).

Section 94816 requires that "[e]ach institution offering a degree program designed to prepare students for a particular vocation, trade, or career field and each institution subject to Article 7 (commencing with Section 94850) . . . provide to each pro-

---

**16.** Section 94739(b) enumerates the types of education institutions that are exempt from regulation under the Reform Act. See CAL EDUC. CODE § 94739(b). It does not appear, and DeVry does not argue, that it falls within any of the exceptions listed in § 94739(b).

**17.** This section became effective January 1, 2004.

spective student a statement in at least 12–point type that contains the following [language]:

'NOTICE CONCERNING TRANSFERABILITY OF UNITS AND DEGREES EARNED AT OUR SCHOOL

Units you earn in our _____ (fill in name of program) program in most cases will probably not be transferable to any other college or university. For example, if you entered our school as a freshman, you will still be a freshman if you enter another college or university at some time in the future even though you earned units here at our school. In addition, if you earn a degree, diploma, or certificate in our _____ (fill in name of program) program, in most cases it will probably not serve as a basis for obtaining a higher level degree at another college or university.' " *Id.*, § 94816.

This disclosure must be signed by both the student and the institution, and dated. *Id.*

Section 94832 prohibits institutions and their representatives from "mak[ing] or caus[ing] to be made any statement that is in any manner untrue or misleading, either by actual statement, omission, or intimation." *Id.*, § 94832(a). It also requires that "[n]o institution or representative of an institution ... engage in any false, deceptive, misleading, or unfair act in connection with any matter, including the institution's advertising and promotion, the recruitment of students for enrollment in the institution, the offer or sale of a program of instruction, course length, course credits, the withholding of equipment, educational materials, or loan or grant funds from a student, training and instruction, the collection of payments, or job placement." *Id.*, § 94832(b).

**c. Section 94985**

Article 13 is titled "Administrative and Judicial Procedures." Sections 94965 and 94975 of the article govern administrative actions. *Id.*, § 94950(a). "Sections 94952 and 94955 authorize the Bureau and the Attorney General to seek various forms of judicial relief in order to enforce this chapter." *Id.*, § 94950(d).

Section 94985, the provision at the center of the parties' dispute, "authorizes civil remedies for individual students in addition to those available under other provisions of law." *Id.*, § 94985(f). Subdivision (a) declares that "[a]ny institution that willfully violates any provision of Section 94800, 94810, 94814, or 94816, Sections 94820 to 94826, inclusive, Section 94829, 94831, or 94832 may not enforce any contract or agreement arising from the transaction in which the violation occurred, and any willful violation is a ground for revoking an approval to operate in this state or for denying a renewal application." *Id.*, § 94985(a).

Subdivision [18] (b) gives a private right of action to "[a]ny person who claims that an institution is operating in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, or Section 94915, or [that] an institution is operating a branch or satellite campus in violation of subdivision (a) of Section 94857." *Id.*, § 94985(b) (stating that such person "may bring an action, in a court of competent jurisdiction, for the recovery of actual and or statutory damages as well as an equity proceeding to restrain and enjoin those violations, or both").[19] The cited provisions require in-

---

18. In keeping with the format of the Education Code, the court refers lettered provisions ((a), (b), (c), etc.) as "subdivisions," and

to numbered provisions ((1), (2), (3), etc.) as "paragraphs."

19. See *id.*, § 94857(a) ("No institution shall establish a branch or satellite campus unless

stitutions to secure Bureau approval before operating or granting degrees in the state.

A prospective plaintiff who intends to sue under § 94985(b) must satisfy various pre-suit notice requirements. Paragraph (b)(1) requires that anyone intending to sue give notice to, and make a demand on, the institution at least thirty-five days prior to filing an action alleging violation of §§ 94831(a), 94900(a), 94915, or 94857(a). See *id.*, § 94985(b)(1). It also requires that the prospective plaintiff give the Bureau notice of intent to sue. The institution may avoid suit by filing an application for Bureau approval within thirty days of receiving notice. If a suit if filed, however, and the court finds that the institution has violated any of §§ 94831(a), 94900(a), 94915, or 94857(a), it *must* grant certain remedies specified in subdivision (b)(2). See *id.*, § 94985(b)(2).[20]

Paragraph (b)(3) declares that "[a]ny violation of subdivision (a) of Section 94831, subdivision (a) of 94900, Section 94915, and subdivision (a) of Section 94857 shall constitute an unfair business practice within the meaning of Section 17200 of the Business and Professions Code." *Id.*, § 94985(b)(3). Paragraph (b)(4) provides

that a certification from the Bureau that the institution has not been approved gives rise to "a conclusive presumption that the institution has violated this subdivision." *Id.*, § 94985(b)(4). Paragraph (b)(5) states that "[a]ll fines and other monetary amounts that an institution is ordered to pay pursuant to this subdivision may be collected from the institution itself and from the individuals who own the institution, whether or not the institution is organized as a corporation." *Id.*, § 94985(b)(5). Finally, paragraph (b)(6) provides:

> "Notwithstanding any provision of the contract or agreement, a student may bring an action for a violation of this article or for an institution's failure to perform its legal obligations and, upon prevailing thereon, is entitled to the recovery of damages, equitable relief, or any other relief authorized by this article, and reasonable attorney's fees and costs." *Id.*, § 94985(b)(6).

Section 94985 has no subdivision (c). The section contains eight additional subdivisions, (d) through (k).

### d. Analysis

Defendants argues that subdivision (b) of § 94985 creates a private right of action

---

the council approves the branch or satellite campus before any students are enrolled for instruction, or any instruction is offered, at that campus").

**20.** *Id.*, § 94985(b)(2) ("If the court finds that the institution has violated subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, all of the following shall occur: (A) The court shall order the institution to cease all operations and to comply with all procedures set forth in this code pertaining to the closure of institutions. (B) The court shall order the institution to pay all students who enrolled while the school was in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857 a refund of all tuition and fees paid to the institution

and a statutory penalty of one thousand dollars ($1,000). (C) The court shall order the institution to pay the prevailing party's attorneys' fees and costs. (D) The court shall order the institution to pay to the bureau all fines incurred pursuant to subparagraph (E) of paragraph (1).(E) Any instrument of indebtedness, enrollment agreement, or contract for educational services is unenforceable pursuant to Section 94838. The court shall order the institution to mail a notice to all students who were enrolled while the school was in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, stating that instruments of indebtedness, enrollment agreements, and contracts for educational services are not enforceable...").

only for violations of §§ 94831(a), 94900(a), 94915, 94857(a), and that Daghlian's action is barred as a consequence. They contend the fact that the legislature specifically cited §§ 94814, 94816, and 94832 in subdivision (a) "vitiates any claims that the Legislature inadvertently failed to provide a remedy for these sections" in subdivision (b).[21] Defendants assert the inclusion of § 94831 in both subdivisions (a) and (b) is evidence that "if the Legislature had intended to provide a private and public right of action for violations of Sections 94814, 94816 and 94832 of the Reform Act, it" could have done so, and "would have treated these sections in the same way that it treated Section 94831." [22]

Daghlian counters that "[a] plain reading of the legislation demonstrates, without a doubt, that the relocation of a student's private right of action as section 94985(b)(6) rather than section 94985(c) was inadvertent drafting error." [23] He contends that paragraph (b)(6)'s use of the word "article" shows that it is an "omnibus" clause that reflects a legislative intent to afford students a private right of action to enforce any provision of the Reform Act.[24] Daghlian argues that the legislative history of Assembly Bill 201, which amended § 94985 in 2001, supports this interpretation. He asserts that the purpose of A.B. 201 was to reform certain aspects of California's Student Tuition Recovery Fund,[25] and that nothing in the legislative history suggests that the bill "was [designed] to eradicate, minimize or even change substantive student rights." [26] Daghlian contends that limiting students' private right of action to §§ 94831(a),

94900(a), 94915, and 94857(a) would undermine the purpose of A.B. 201 and the objectives of the Reform Act.[27] He also maintains that defendants' construction creates internal inconsistencies in the legislative scheme and that if the provision governing students' private right of action is denominated paragraph (b)(6) rather than subdivision (c), subdivisions (d), (g), (h), (k), and the rest of subdivision (b) would be meaningless.[28]

#### i. Language Of § 94985(b)(6)

A plain reading of § 94985(b)(6) indicates that the California legislature intended to grant students a broad private right of action. Without specifying particular sections of the Reform Act, the provision authorizes students to bring suit to enforce "a violation of this article or [to redress] . . . an institution's failure to perform its legal obligations." CAL. EDUC. CODE § 94985(b)(6). This right cannot be waived; students may sue "[n]otwithstanding any provision of a contract or agreement." *Id.* In addition, the provision affords students a wide range of remedies, including legal damages, equitable relief, attorneys' fees, "or any other relief authorized by this article." *Id.*

Defendants urge a narrower construction of paragraph (b)(6). Emphasizing the phrase "[n]otwithstanding any provision of a contract or agreement," they argue that the provision means only that "clauses in contracts that seek to void *all* private claims under the *Education Code* . . . are

---

21. Defs.' Mot. at 7.

22. *Id.*

23. Pl.'s Opp. at 10.

24. *Id.* at 12.

25. *Id.* at 8.

26. *Id.* at 10.

27. *Id.* at 10–13.

28. *Id.* at 13–14.

against public policy." [29] Defendants take the opening clause out of context. The balance of the paragraph clearly provides that students may bring an action for "a violation of this article or an institution's failure to perform its legal obligations." *Id.* See *Dyna–Med, Inc.*, 43 Cal.3d at 1386–87, 241 Cal.Rptr. 67, 743 P.2d 1323 (in construing a statute, a court should "accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose"). Paragraph (b)(6)'s use of the word "article" stands in stark contrast to prior paragraphs' references to specific "subdivisions." See, e.g., CAL. EDUC. CODE §§ 94985(b)(1)(A) (plaintiff must "[n]otify the institution alleged to have violated subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, of the particular alleged violations"), 94985(b)(4) ("A certification, issued by the bureau ... shall establish a conclusive presumption that the institution has violated this *subdivision*" (emphasis added)), 94985(b)(5) ("All fines and other monetary amounts that an institution is ordered to pay pursuant to this *subdivision* may be collected from the institution itself and from the individuals who own the institu-

tion, whether or not the institution is organized as a corporation" (emphasis added)).

The use of the open-ended phrase "or an institution's failure to perform its legal obligations" also distinguishes paragraph (b)(6) from prior paragraphs, all of which make clear that they address only an institution's operation without Bureau approval in violation of §§ 94831(a), 94900, 94915, or 94857(a).[30] See *id.*, § 94985(b). The repetition of the phrase, "subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857" in paragraphs (b)(1) through (b)(5), and its absence from paragraph (b)(6), strongly suggests that the California legislature did not intend to limit the applicability of paragraph (b)(6) to private claims under these particular sections. See, e.g., *id.*, §§ 94985(b)(1)(A) (plaintiff must "[n]otify the institution alleged to have violated "subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, Section 94915, or subdivision (a) of Section 94857 of the particular alleged violations"), 94985(b)(1)(B) (same), 94985(b)(1)(C) (same), 94985(b)(1)(E) (same), 94985(b)(1)(F) (same), 94985(b)(1)(G) (same), 94985(b)(2)

---

**29.** Defendants DeVry, Inc. and DeVry University, Inc.'s Reply Brief in Support of Motion to Dismiss Plaintiff's First Amended Complaint ("Defs.' Reply") at 15 (emphasis added).

**30.** Sections 94831, 94900, and 94915 require Bureau approval to operate, confer degrees, and offer educational services or programs. Section 94857 requires approval to operate a branch or satellite campus. See CAL. EDUC. CODE §§ 94831(a) ("No institution, or representative of that institution shall ... [o]perate in this state a postsecondary educational institution not exempted from this chapter, unless the institution is currently approved to operate pursuant to this chapter. The council may institute an action, pursuant to Section 94955, to prevent any individual or entity from operating an institution in this state that

has not been approved to operate pursuant to this chapter and to obtain any relief authorized by that section"), 94900(a) ("No private postsecondary educational institution may issue, confer, or award an academic or honorary degree unless the institution is approved by the council to operate in California and award degrees"), 94915 ("No private postsecondary educational institution ... may offer educational services or programs unless the institution or locations at which these services or programs are offered have been approved by the council as meeting the requirements of this section"), 94857(a) ("No institution shall establish a branch or satellite campus unless the council approves the branch or satellite campus before any students are enrolled for instruction, or any instruction is offered, at that campus").

(same), 94985(b)(2)(B) (same), 94985(b)(2)(E) (same), 94985(b)(3) (same), 94985(b)(4) (same).

### ii. Context Of § 94985

Reading § 94985 in context also supports Daghlian's position that the private right of action provision should have been denominated subdivision (c), rather than paragraph (b)(6). See *Lungren,* 45 Cal.3d at 735, 248 Cal.Rptr. 115, 755 P.2d 299 ("The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible," citing *Dyna–Med, Inc.,* 43 Cal.3d at 1386–87, 241 Cal.Rptr. 67, 743 P.2d 1323. Like paragraph (b)(6), subdivisions (e) through (k) are relatively broad in scope, referring to causes of actions under "this section" or "this article." Subdivision (e), for example, confirms that "[t]he remedies provided in *this article* supplement, but do not supplant, the remedies provided under any other provision of law." CAL. EDUC. CODE § 94985(e) (emphasis added). Subdivision (f) imposes a three-year statute of limitations on actions "brought under *this section.*" *Id.,* § 94985(f) (emphasis added). See also *id.,* §§ 94985(g) (referring to "*any right or remedy* " (emphasis added)), 94985(h) (governing the assignment of any "cause of action for a violation of *this article* " (emphasis added)).

Furthermore, like paragraph (b)(6), many of these subdivisions address suits by "students," in contrast to paragraphs (b)(1) through (b)(5), which concern suits by "any person." Subdivision (g), for example, declares void and unenforceable "[a]ny provision in any agreement that purports to require a *student* to invoke any grievance dispute procedure established by the institution. . . ." *Id.,*

§ 94985(g) (emphasis added). Similarly, subdivision (h) provides that "[a] *student* may assign his or her cause of action for a violation of this article to the bureau, or to any state or federal agency that guaranteed or reinsured a loan for the student or that provided any grant or other financial aid." *Id.,* § 94985(h) (emphasis added).

Subdivision (k) of § 94985 sets forth certain notification requirements for students who bring an action against an institution. It provides:

"If a student commences an action or asserts any claim in an existing action for recovery on behalf of a class of persons, or on behalf of the general public, under Section 17200 of the Business and Professions Code, the student shall notify the bureau of the existence of the lawsuit, the court in which the action is pending, the case number of the action, and the date of the filing of the action or of the assertion of the claim. The student shall notify the bureau as required by this subdivision within 30 days of the filing of the action or of the first assertion of the claim, whichever is later. The student shall also notify the court that he or she has notified the bureau pursuant to this subdivision. Notwithstanding any other provision of law, no judgment may be entered pursuant to this section until the student has notified the bureau of the suit and notified the court that the bureau has been notified. This subdivision only applies to a new action filed or to a new claim asserted on or after January 1, 2002." *Id.,* § 94985(k).

Plaintiff argues that defendants' proposed construction of the statute, which would limit students' private right of action to violations of §§ 94831(a), 94900, 94915(a), and 94857(a), would render subdivision (k) meaningless.[31] The court agrees. Subdi-

---

**31.** Pl.'s Opp. at 14.

vision (b) sets forth a detailed pre-suit notification procedure that must be followed by a party who wishes to sue for violation of §§ 94831(a), 94900, 94915(a), and 94857(a). Subparagraph (b)(1) requires that, "[a]t least 35 days prior to the commencement of an action pursuant to this subdivision," "[a]ny person," including a student, who intends to sue must notify the institution of "the particular alleged violations," and "[d]emand that the institution apply for the bureau's approval to operate as required by subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, whichever is applicable." *Id.*, §§ 94985(b)(1)(A), 94985(b)(1)(B). This notice must "be in writing, and ... be sent by regular mail and certified or registered mail, return receipt requested, to the location of the institution that is allegedly operating in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, whichever is applicable." *Id.*, § 94985(b)(1)(C). The institution then has thirty working days "from the receipt of the notice, to file an application for approval to operate with the bureau." *Id.*, § 94985(b)(1)(D). If, "within 30 working days after receipt of the notice, [it] applies for the bureau's approval to operate as required by subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857," the plaintiff is barred from bringing suit. *Id.*, § 94985(b)(1)(E). If, however, "within 35 days after receipt of the notice, the bureau has not received an application from the institution, the bureau shall mail the plaintiff a certification that the institution has not applied or been approved to operate pursuant to subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857." *Id.*, § 94985(b)(1)(F). Such certification "es-

tablish[es] a conclusive presumption that the institution has violated this subdivision." *Id.*, § 94985(b)(4).

The prospective plaintiff must also "notify the bureau by mail and by certified or registered mail, return receipt requested, that he or she intends to bring an action pursuant to this section against the institution." *Id.*, § 94985(b)(1)(G). Upon receipt of this notice, the Bureau must investigate the institution's compliance or noncompliance with the approval provisions. See *id.* ("Upon receipt of this notice, the bureau shall immediately investigate the institution's compliance with subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857, whichever is applicable ...."). If the investigation reveals "that the institution has violated the applicable section, the bureau shall immediately order the institution to cease and desist operations." *Id.* An institution that "continues to operate in violation of the bureau's cease and desist order" can be fined $1,000 per day. *Id.*

Subdivision (b) allows an institution to avoid a suit for violation of §§ 94831(a), 94900(a), 94915, or § 94857(a), by applying for Bureau approval within thirty days of notification. It also imposes a responsibility on the Bureau to determine whether the institution has complied with the approval provision in question. These provisions make sense, as §§ 94831(a), 94900(a), 94915, and § 94857(a) all concern an institution's obligation to obtain approval from the Bureau, not duties owed to students or other persons. Furthermore, because an institution's failure to obtain approval from the Bureau before conducting operations affects all of its students, subdivision (b) requires that a court that finds a violation "order the institution to cease all operations." *Id.*, § 94985(b)(2)(A). In addition, the court must "order the institution to

pay all students who enrolled while the school was in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, or subdivision (a) of Section 94857 a refund of all tuition and fees paid to the institution and a statutory penalty of one thousand dollars ($1,000)." *Id.,* § 94985(b)(2)(B).

In contrast to the notice provisions set forth in subdivision (b), subdivision (k) requires a student who "commences an action or asserts any claim in an existing action for recovery on behalf of a class of persons, or on behalf of the general public, under Section 17200 of the Business and Professions Code" to inform the Bureau of the action. *Id.,* § 94985(k). If, as defendants contend, a student's private right of action is restricted to claims that an institution violated §§ 94831(a), 94900(a), 94915, and § 94857(a), there would have been no need for the legislature to have enacted subdivision (k). See *id.,* § 94985(b)(1) (governing actions in which a "person … claims that an institution is operating in violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, or Section 94915, or an institution is operating a branch or satellite campus in violation of subdivision (a) of Section 94857"); see also *id.,* § 94985(b)(3) ("Any violation of subdivision (a) of Section 94831, subdivision (a) of Section 94900, Section 94915, and subdivision (a) of Section 94857 shall constitute an unfair business practice within the meaning of Section 17200 of the Business and Professions Code").

Moreover, the notification requirements in subdivision (k) conflict with those in subdivision (b). Paragraph (b)(1) requires that a prospective plaintiff notify the Bureau that he or she "intends to" commence an action against an institution. *Id.,* § 98945(b)(1)(G). Although the paragraph does not specify a time limit, its use of the phrase "intends to" indicates that such notice must be given prior to filing suit. Subdivision (k), by contrast, states that "[i]f a student commences an action or asserts any claim in an existing action" under § 17200, he or she must inform Bureau of the existence of the lawsuit "within 30 days of the filing of the action or of the first assertion of the claim, whichever is later." *Id.,* § 94895(k). The student must also notify the Bureau of "the court in which the action is pending, the case number of the action, and the date of the filing of the action or of the assertion of the claim." *Id.* Finally, subdivision (k) mandates that a student advise the court that he or she has notified the Bureau; if a student fails to do so, no judgment can be entered in the case. *Id.* None of these additional requirements appears in subdivision (b). Even more significantly, subdivision (k) differs from subdivision (b) in that it does not require that the student give any notice or make any demand on the institution prior to filing suit or asserting the claim.

Daghlian's construction avoids potential inconsistency between these sections. If, as he asserts, students have a private right of action to challenge any "violation of this article or an institution's failure to perform its legal obligations," then certain student suits fall outside the scope of paragraph (b)(1). Subdivision (k) provides a mechanism by which the Bureau can learn of large student class actions brought against institutions under § 17200. It does not require the Bureau to issue a certification or to conduct its own investigation, however, since such suits do not implicate the approval process, but instead concern injury suffered by a particular group of students. Read in this way, subdivision (k) serves a purpose distinct from subdivision (b). See *Moyer,* 10 Cal.3d at 230, 110 Cal.Rptr. 144, 514 P.2d 1224 ("When used in a statute [words] must be construed in

context, keeping in mind the nature and obvious purpose of the statute where they appear. Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole" (citations and internal quotation marks omitted)). See also *Leslie Salt Co. v. San Franicsco Bay Conservation & Dev. Comm'n,* 153 Cal.App.3d 605, 614, 200 Cal.Rptr. 575 (1984) ("The meaning of the words of a statute or, to use the alternative approach favored by many courts, the intent of the Legislature, can only be determined with reference to the context in which the words are used; that is, with reference to such purpose as may be discerned from examining the entire enactment of which the words are part. A statutory phrase may be said to be clear and unambiguous if the meaning assigned to it is not in conflict with other language in the act" (citations and footnote omitted)).

In sum, the language of the students' private right of action provision, as well as the overall context of § 94985, suggest that it was erroneously numbered as the final paragraph of subdivision (b), and that the legislature's failure to denominate it subdivision (c) was an inadvertent drafting mistake.

### iii. Purpose And Legislative History

The history and purpose of the Reform Act, and amendments made subsequent to its enactment provide further support for Daghlian's position. The statute states that one of its principal objectives is to "protect[ ] the citizens of the state from fraudulent or substandard operations." CAL. EDUC. CODE § 94705. To this end, the legislature "[e]stablish[ed] minimum standards concerning the quality of education, ethical and business practices, health and safety, and fiscal responsibility to provide protection against substandard, transient, unethical, deceptive, or fraudulent institutions and practices" (*id.,* § 94705(c)), and to "protect[ ] the consumer and students against fraud, misrepresentation, or other practices that may lead to an improper loss of funds paid for educational costs...." (*id.,* § 94705(f)).

In 1997, the California Legislature passed Assembly Bill 71, which made numerous substantive changes to the Reform Act. See 1997 Cal. Legis. Serv. ch. 78 (A.B.71) (West). A.B. 71 added Chapter 7 to the act, which includes §§ 94814, 94816, and 94832. See 1997 Cal. Legis. Serv. ch. 78, § 4. It also enacted § 94985, which provides:

"(a) Any institution that willfully violates any provision of Section 94800, 94810, 94814, or 94816, Sections 94820 to 94826, inclusive, Section 94829, 94831, or 94832 may not enforce any contract or agreement arising from the transaction in which the violation occurred, and any willful violation is a ground for revoking an approval to operate in this state or for denying a renewal application.

(b) Notwithstanding any provision of the contract or agreement, a student may bring an action for a violation of this article or for an institution's failure to perform its legal obligations and, upon prevailing thereon, is entitled to the recovery of damages, equitable relief, or any other relief authorized by this article, and reasonable attorney's fees and costs...." *Id.* See also CAL. EDUC. CODE §§ 94985(a)-(b) (2001).

Subdivision (b) of the statute, as originally passed, gave students a broad right to sue under the Reform Act. See, e.g., *Payne v. Nat'l Collection Systems, Inc.,* 91 Cal. App.4th 1037, 1040, 111 Cal.Rptr.2d 260 (2001) (class action involving twenty-three plaintiffs for violation of Education Code §§ 94831, 94832, and 94838, Business and

Professions Code §§ 17200 and 17500, and the Consumers Legal Remedies Act).

In 2001, the California Legislature passed A.B. 201. See 2001 Cal. Legis. Serv. ch. 621 (A.B.201) (West). A review of the legislative reports regarding A.B. 201 shows that its primary purpose was to reform the California's Student Tuition Recovery Fund ("STRF"). The report of the April 17, 2001 hearing before the Assembly Committee on Higher Education notes:

"Under the Act, STRF was created to attempt to make students financially whole in the event a school prematurely closes without completing a student's term of education. STRF is paid into by certain qualified schools based on a formula that accounts for the number of students and the cost of tuition at the institution. The Act also gives the Bureau the ability to levy a special assessment, at virtually anytime in the fiscal year, upon these schools in the event STRF is insufficient to pay any necessary claims.

Recent court cases (including *Aguirre v. Hamilton*—San Francisco Superior Court Case Number 308354) have ordered repayment from STRF to students who were owed monies as the result of the closure of several schools. Because the total repayments exceeded the funds available in STRF, the Bureau ordered further assessments that were to be paid immediately. The affected schools opposed this assessment and contend that the courts erred in their findings and subsequent order. The schools also contend that having all of the schools pay for the actions of the schools that closed is unfair. After much debate, the increased assessments were withdrawn. Subsequently, the Bureau, along with the regulated schools and advocacy groups, have searched for

an alternative to make STRF solvent in order to pay the recent claims.

This bill seeks to ensure the solvency of STRF by requiring schools to disclose the status of their STRF payments and in case of a deficiency, formulate a plan to become current. Furthermore, it allows the Bureau to track litigation against regulated schools and eliminates some confusion around STRF responsibilities for third-party payers." Cal. Bill Analysis, A.B. 201, Assembly Committee on Higher Education (Apr. 17, 2001).

Although AB 201 was primarily concerned with reforms to the STRF, it did make other substantive changes to the Reform Act. As pertinent here, the bill amended § 94985 to add subdivisions (b) and (k). See 2001 Cal. Legis. Serv. ch. 621, § 10 (A.B.201). Although the legislation did not alter the language of the students' private right of action provision, it renumbered the provision paragraph (b)(6). The enrolled bill contains no subdivision (c).

The legislative reports do not reflect any reason for the omission of subdivision (c) from the final version of § 94985. Nor do they reflect, expressly or implicitly, that, in amending § 94985, the legislature intended severely to restrict students' private right of action. The April 17, 2001 report, for instance, summarizes the purpose of the bill as follows:

"[T]his bill:

1) Requires that any audit or financial report required to be prepared under the act contain a statement signed by the individual who has prepared the report certifying that the institution has paid or not paid to the Bureau all amounts owed to the Student Tuition Recovery Fund (STRF). Requires that an institution that has not paid all amounts owed to the Bureau ... re-

port within 30 days on its plan to become current in these payments.

2) Requires a student who brings an action or asserts any claim in an existing action for recovery on behalf of a class of persons to notify the Bureau of the existence of the lawsuit, the court in which the action is pending, the case number of the action, and the date of the filing of the action or of the assertion of the claim, within 30 days of the filing of the action. Further requires the student to notify the court that he or she has notified the Bureau pursuant to this provision, and prohibits a judgment from being entered pursuant to this provision until the student has complied.

3) Requires the Bureau to send to such student who applies for payment from STRF a written notice specifying the rights of the student under these provisions.

4) Requires the Bureau to submit an annual report to the chairpersons of the Assembly Committee on Higher Education, the Senate Committee on Education, the Assembly Committee on Budget, and the Senate Committee on Budget and Fiscal Review on the collection and expenditure of moneys collected as special assessments under this bill, as prescribed." Cal. Bill Analysis, A.B. 201, Assembly Committee on Higher Education (Apr. 17, 2001).

Other legislative reports are similarly devoid of any indication that the Legislature intended to effect such a radical change. See, e.g., Cal. Bill. Analysis, A.B. 201 Assembly Committee on Appropriations (May 9, 2001); Cal. Bill. Analysis, A.B. 201 Senate Committee on Education (June 27, 2001); Cal. Bill Analysis, A.B. 201 Senate

Committee on Business and Profession (Aug. 20, 2001); Cal. Bill. Analysis, A.B. 201 Assembly Floor (Sept. 13, 2001).

The legislative history of A.B. 201, therefore, does not support defendants' assertion that it is "clear ... the Legislature expressly chose to exclude a private right of action as a remedy for violations of Sections 94814, 94816, and 94832."[32] Not only is defendants' proposed construction of the students' private right of action provision at odds with the legislative history, it is also inconsistent with the overarching purpose of the Reform Act, which was to protect "students against fraud, misrepresentation, or other practices that may lead to an improper loss of funds paid for educational costs...." CAL. EDUC. CODE § 94705(f). Consequently, the purpose and history of the Reform Act militate against defendants' literal construction of § 94985(b)(6). See Lungren, 45 Cal.3d at 735, 248 Cal.Rptr. 115, 755 P.2d 299 ("Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute"); Cossack v. City of Los Angeles, 11 Cal.3d 726, 732–33, 114 Cal.Rptr. 460, 523 P.2d 260 (1974) ("Statutes should be construed so as to be given a reasonable result consistent with the legislative purpose.... The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.... The apparent purpose of a statute will not be sacrificed to a literal construction" (citations and internal quotation marks omitted)). See also Leslie Salt Co., 153 Cal. App.3d at 614, 200 Cal.Rptr. 575 ("The courts resist blind obedience to the putative 'plain meaning of a statutory phrase where literal interpretation would defeat

32. Defs.' Mot. at 6–7.

the Legislature's central objective' " (citation and footnote omitted)).

#### iv. Conclusion

Citing *White v. E–Loan, Inc.,* 409 F.Supp.2d 1183, 1187 (N.D.Cal.2006), defendants argue that even if paragraph (b)(6) was the result of a drafting error, generally the legislature, not the court, should correct the error.[33] In *White,* a prospective borrower brought a putative class action against a lender, alleging violation of the Fair Credit Report Act ("FCRA"), 15 U.S.C. § 1681m(d). *Id.* at 1183. The lender moved for judgment on the pleadings, arguing that § 1681m(h)(8)(A) authorized a private cause of action only for violation of § 1681m, not for violation of § 1681m(d). See *id.* at 1184 (citing 15 U.S.C. § 1681m(h)(8)(A) ("Section 1681n and 1681o of this title shall not apply to any failure by any person to comply with this *section* " (emphasis added))). The district court agreed with defendant that the word "section" clearly referred to § 1681m, not § 1681m(h), a "subsection." See *id.* at 1185 ("As the Supreme Court recently discussed, Congress follows a convention when it uses organizational terms in statutes. A 'section' is broken down into subparts as follows: 'subsections,' which begin with '(a)'; 'paragraphs,' which begin with '(1)' ...."). Plaintiff contended that the appearance of the word "section" at the end of § 1681m(h)(8)(A) was merely "a scrivener's error attributable to the fact that § 1681m(h) was enacted as Section 311 of the Fair and Accurate Credit Transaction Act...." *Id.* After considering plaintiff's structural and policy arguments, the district court "acknowledge[d] that there [was] no way to perfectly reconcile the contents of § 1681m(h)(8) with the remainder of § 1681m," and noted that

"[p]laintiffs may indeed be correct that the text of § 1681m(h)(8) is the result of a scrivener's error." *Id.* at 1187. It declined to correct the error, however, stating that "it is not for this Court to rewrite the words that Congress has chosen." *Id.* (citing *Lamie v. United States Trustee,* 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. 'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result.' This allows both of our branches to adhere to our respected, and respective, constitutional roles. In the meantime, we must determine intent from the statute before us")).

 *White* is neither controlling nor persuasive, since this case involves a *state,* rather than a federal, statute. As noted, when a federal court sitting in diversity interprets a state statute, it must apply state rules of statutory construction. *In re First T.D. & Inv.,* 253 F.3d at 527; *Fed. Sav. & Loan Ins. Corp.,* 904 F.2d at 510; *In re Anderson,* 824 F.2d at 756. See also *Dimidowich,* 803 F.2d at 1482 ("Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it"). Under California law, as under federal law, statutory construction begins with the words of the statute itself. *Pacific Gas & Elec. Co.,* 16 Cal.4th at 1152, 69 Cal.Rptr.2d 329, 947 P.2d 291. The ultimate task of statutory construction, however, is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law," *S.D. Myers, Inc.,* 336 F.3d at 1179 (internal citation and quotation marks omitted)). In carry-

---

**33.** Defs.' Reply at 15.

ing out this task, California courts have corrected drafting errors. See *Szold v. Med. Bd. of Cal.*, 127 Cal.App.4th 591, 25 Cal.Rptr.3d 665 (2005) (after considering the text and legislative history of a statute, the court found that insertion of the word "of" for "or" was an inadvertent drafting error and stated: "We interpret statutes so as to avoid giving effect to drafting errors," citing *People v. Superior Court (Blanquel)*, 85 Cal.App.4th 768, 771, 102 Cal.Rptr.2d 429 (2000)); *In re Chavez*, 114 Cal.App.4th 989, 998, 8 Cal.Rptr.3d 395 (2004) ("Our suspicion that the 1983 amendment was indeed a drafting error is strengthened by the fact that SB 813 was not focused upon penal laws but was a voluminous bill devoted in large part to educational reforms that required the simultaneous amendment of hundreds of code sections. Such circumstances can create a 'dangerous potential for drafting errors.' Given the legislative history and the surrounding circumstances we are convinced the 1983 amendment was a drafting error and was not enacted for any deterrent purpose," citing *People v. Alexander*, 178 Cal.App.3d 1250, 1261–62, 224 Cal. Rptr. 290 (1986) ("Chapter 1635's sudden inconsistent and incongruous treatment of PCP offenses ... strongly suggests confusion and errors in drafting the various amendments and reenacted statutes that made up the chapter. This suggestion is further strengthened when one considers the Act's complex scheme of interrelated complementary statutes, the complicated task of updating the cross-references to reflect the new schedules, and the fact that chapter 1635 involved the simultaneous amendment of dozens of other statutes in the Business and Professions, Education, Government, Penal, Vehicle, and Welfare and Institution Codes. Certainly such circumstances created a dangerous potential for drafting errors" (footnotes omitted)); see *Alexander*, 178 Cal.App.3d at 1263, 224 Cal.Rptr. 290 ("The lack of intent to legalize sale of PCP becomes even more evident in light of the absurd consequences such legalization would have.... [W]e conclude that where, as here, it is obvious that the Legislature inadvertently deleted the sanctions against selling PCP because of a drafting error, such a 'repeal' cannot and does not reflect an intent to pardon illegal sales that were committed prior to the error").

The California Supreme Court has cautioned, however, that courts should not rewrite a statute unless necessary to effectuate the Legislature's clear intent. See *People v. Garcia*, 21 Cal.4th 1, 5–6, 87 Cal.Rptr.2d 114, 980 P.2d 829 (1999) ("The parties' briefs, lower court opinions and our own research have disclosed a number of possible resolutions of this postulated internal conflict, all based on the premise [that] the distinction between paragraphs (B) and (D) of section 667, subdivision (d)(3) is a result of 'drafting error.' As we demonstrate later, however, each such resolution would require the court to disregard one of the two assertedly conflicting paragraphs or to rewrite some of their provisions. Although we may properly decide upon such a construction or reformation when compelled by necessity and supported by firm evidence of the drafters' true intent, we should not do so when the statute is reasonably susceptible to an interpretation that harmonizes all of its parts without disregarding or altering any of them," citing *People v. Skinner*, 39 Cal.3d 765, 775, 217 Cal.Rptr. 685, 704 P.2d 752 (1985)).

■ Here, the text of the students' private right of action provision, the larger context of the statutory scheme, and the purpose and history of the Reform Act and amendments to it all suggest that the legislature's renumbering of the provision as paragraph (b)(6), rather than subdivision

(c), was a drafting error. Even were this not so, however, the court would conclude that, regardless of its placement, the language of the students' private right of action provision clearly grants students a cause of action "for violation of this *article*," and does not limit the right to any single section or subdivision. CAL. EDUC. CODE § 94985(b)(6) (emphasis added). See *Szold*, 127 Cal.App.4th at 596, 25 Cal. Rptr.3d 665 ("In construing any statute, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of law.... *We first examine the words themselves* because the statutory language is generally the most reliable indicator of legislative intent,'" quoting *Whaley v. Sony Computer Entertainment America, Inc.*, 121 Cal.App.4th 479, 484–85, 17 Cal.Rptr.3d 88 (2004) (internal citations omitted; emphasis added)). Stated differently, even if the provision is properly numbered paragraph (b)(6), its use of the word "article" stands in contrast to use of the word "subdivision" in other paragraphs of subdivision (b). See CAL. EDUC. CODE § 94985(b)(1), (b)(5). Ordinary principles of statutory construction require that this difference be given effect. See *Briggs v. Eden Council for Hope and Opportunity*, 19 Cal.4th 1106, 81 Cal. Rptr.2d 471, 969 P.2d 564 (1999) (examining California Code of Civil Procedure § 425.16(e), and concluding that because "[c]lauses (3) and (4) of section 425.16, subdivision (e), concerning statements made in public fora and 'other conduct' implicating speech or petition rights, include[d] an express 'issue of public interest' limitation," while "clauses (1) and (2), concerning statements made before or in connection with issues under review by official proceedings, contain[ed] no such limitation," the court had to give effect to the "variation in phraseology," and "presume[] the Legislature intended different 'issue' requirements to apply to anti-SLAPP motions brought under clauses (3) and (4) of subdivision (e) than to motions brought under clauses (1) and (2)"). Accordingly, the court concludes that Daghlian's first cause of action is authorized by the Education Code, and rejects defendants' first ground for dismissal of this claim.

## 2. Whether The Consumer Protection Provisions Of The Reform Act Apply To DeVry

Defendants next argue that Daghlian's first cause of action must be dismissed because the requirements of Education Code §§ 94814, 94816, and 94832 do not apply to institutions like DeVry that have been accredited by a regional accrediting agency other than the Western Association of Schools and Colleges ("non-WASC regionally accredited institutions").[34] Daghlian counters that Senate Bill 967, which added statutory language addressing regionally accredited institutions, merely streamlined the Bureau's process of approving such accreditations. He contends that the Act does not exempt non-WASC regionally accredited institutions from complying with the consumer protection provisions set forth in §§ 94814, 94816, and 94832.[35]

### a. Requests For Judicial Notice

██ On a Rule 12(b)(6) motion, the court's review is generally limited to the contents of the complaint. See *Campanelli*, 100 F.3d at 1479; *Allarcom Pay Television*, 69 F.3d at 385. Rule 12(b)(6) provides that when "matters outside the

---

**34.** Defs.' Mot. at 3–4.

**35.** Pl.'s Opp. at 16–18.

pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED.R.CIV. PROC. 12(b)(6). "There are, however, two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001) (citation omitted). Under the first exception, "a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment." *Id.* (citation omitted). "Second, under Fed.R.Evid. 201, a court may take judicial notice of 'matters of public record.'" *Id.* at 688–89 (citing *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279,

1282 (9th Cir.1986)). In deciding a Rule 12(b)(6) motion, a court may judicially notice "not only ... the existence of a particular document, but the substance of the document as well." *Miles, Inc. v. Scripps Clinic and Research Foundation*, 951 F.2d 361, 1991 WL 276450, *1 (9th Cir. Dec.23, 1991) (Unpub.Disp.) (citing *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1403 (9th Cir.1989)).

 In support of their motion to dismiss, defendants ask that the court take judicial notice of several documents outside the pleadings. First, defendants request that the court judicially notice the fact that DeVry is an non-WASC regionally accredited institution. In support of this request, defendants present the Higher Learning Commission's website[36] and the Bureau's Directory of Approved Institutions—Non–WASC Regionally Accredited (CEC 949095).[37] Second, defendants

**36.** Defendants DeVry, Inc. and DeVry University, Inc.'s Request for Judicial Notice in Support of Their Motion to Dismiss Plaintiff's First Amended Complaint ("Defs.' RJN"), Exh. A (Higher Learning Commission website, DeVry University, printed Apr. 5, 2006 ("HLC website")).

**37.** Defendants DeVry, Inc. and DeVry University, Inc.'s Request for Judicial Notice in Support of Their Reply in Support of Motion to Dismiss Plaintiff's First Amended Complaint ("Defs.' RJN 2"), Exh. 2 (California Department of Consumer Affairs, Bureau for Private Postsecondary and Vocational Education Directory of Approved Institutions—Non–WASC Regionally Accredited (CEC 94905), dated May 11, 2006, available at http: //www. bppve.ca.gov/directories/cec90905.pdf) ("Bureau Non–WASC Directory")).

In general, "[i]t is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than [those that were] presented in the moving papers." William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 12:107 (The Rutter Group 2005). For this reason, the court has discretion to decline to

consider new facts or arguments raised in a reply. See *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir.2000) ("This court does not ordinarily review issues raised for the first time in a reply brief.... The reasons are obvious. It robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result"); *Burnham v. City of Rohnert Park*, No. C 92–1439, 1992 WL 672965, *5 (N.D.Cal. May 18, 1992) ("[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion"); *Scott v. R.J. Reynolds Tobacco Co.*, No. Civ.A. 99–3091, 2001 WL 797992, *5 (E.D.La. July 12, 2001) (same).

The district court may, in its discretion, "consider the [new] issue even if it was raised in a reply brief." *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir.2001) (internal citation and quotation omitted). If the court elects to consider new material in a reply brief, however, it must afford the opposing party an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996) ("We agree with the Seventh Circuit, which

request that the court judicially notice the Bureau's position on non-WASC regionally accredited institutions, as reflected in the Bureau's Initial Report of the Operations and Administrative Monitor dated September 26, 2005 (the "Operation Monitor's 2005 Initial Report").[38] Specifically, defendants ask that the court take judicial notice of a passage that states, in part:

"It is the Department's position that none of the consumer protection provisions contained in Article 6 and elsewhere in the Reform Act are applicable to these [non-WASC regionally accredited] institutions, including requirements related to (1) providing prospective students with a *School Performance Fact Sheet* and transferability of credits disclosure; (2) incorporation of Bureau con-

tact information in all student enrollment agreements, and (3) providing the Bureau with an annual report and copies of all accrediting agency reports and audit reports prepared by the U.S. Department of Education and student loan guarantee agencies." [39]

Third, defendants seek judicial notice of pages 3 and 7 of the Bureau's Annual Report to the Legislature and California Postsecondary Education Commission for Fiscal Year 2004–2005, dated April 20, 2006 ("Bureau's 2004–2005 Annual Report" or "Annual Report").[40] These pages outline the Bureau's general responsibilities,[41] and describe its position respecting the applicability of the consumer protection provisions to non-WASC regionally accredited institutions.[42] Finally, defendants re-

held that '[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond' "); *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir.1990) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond"); see *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040–41 (9th Cir. 2003) (indicating that the court may consider new issues raised on reply if it gives the opposition an opportunity to respond).

Here, defendants submitted a second request for judicial notice in conjunction with their reply to plaintiff's opposition. They contend the documents were not available at the time the moving papers were submitted. (Defs.' RJN 2 at 1.) Because plaintiff responded to the second request (see Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Request for Judicial Notice Submitted in Support of Their Reply in Support of Their Motion to Dismiss Plaintiff's First Amended Complaint ("Pl.'s Opp. to Defs.' RJN 2")), the court will consider the request on its merits.

**38.** Defs.' RJN, Exh. B (Bureau for Private Postsecondary and Vocational Education, Initial Report of the Operations and Administra-

tive Monitor, dated Sept. 26, 2005, at 136–37 ("Operation Monitor's 2005 Initial Report")).

**39.** Defs.' RJN, Exh. B at 174 (Operation Monitor's 2005 Initial Report at 137). See Defs.' Mot. at 4–5.

**40.** Defs.' RJN 2, Exh. 1 (Bureau for Private Postsecondary and Vocational Education Directory 's Annual Report to the Legislature and California Postsecondary Education Commission, Fiscal Year 2004–2005, dated April 20, 2006, available at http://www.dca.ca.gov/reports/04_05_bppve_annrpt.pdf("Bureau's 2004–2005 Annual Report")).

**41.** See *id.,* Exh. 1 at 9 (Bureau's 2004–2005 Annual Report at 3 ("The Bureau for Private Postsecondary and Vocational Education (Bureau) approves and regulates private postsecondary and vocational institutions in California")).

**42.** See *id.,* Exh. 1 at 13 (Bureau's 2004–2005 Annual Report at 7 ("SB 967 now exempts these non-WASC regionally accredited institutions from most of the Reform Act, but still requires them to be approved by the Bureau based on a minimal number of requirements largely based on the institution's financial stability and accreditation status. Consequently, SB 967 requires the Bureau to approve these schools, but exempts them from providing

quest that the court judicially notice the text of S.B. 967.[43]

Daghlian does not oppose the request for judicial notice of the Higher Learning Commission's webpage, the Bureau's Non–WASC Directory, or S.B. 967.[44] Because DeVry's accreditation status and the text of S.B. 967 are matters of public record, which are not subject to reasonable dispute, the court will judicially notice these items. See Fed.R.Evid. 201(b). See also *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959) (court may take judicial notice of the legislative history of a bill); *Palmer v. Stassinos*, 348 F.Supp.2d 1070, 1077 (C.D.Cal.2004) (taking judicial notice of legislative history materials, as well as sampling of complaints and default judgments filed in California courts, because they "constitute judicial facts sufficiently capable of accurate and ready determination"); *Korematsu v. United States*, 584 F.Supp. 1406, 1414 (C.D.Cal.1984) (a court may take judicial notice of legislative facts, such as legislative history, which are "established truths, facts or pronouncements that do not change from case to case but [are applied] universally, while adjudicative facts are those developed in a particular case" (citation omitted)).[45]

Daghlian opposes defendants' request for judicial notice of the Operation Monitor's 2005 Initial Report and the Bureau's 2004–2005 Annual Report, however.[46] He argues that the Initial Report is not a proper subject for judicial notice because it is not a formal opinion and therefore constitutes hearsay,[47] and that the court cannot judicially notice the cited portions of the Annual Report because they contain information that is in dispute in this litigation.[48]

The Bureau is an administrative body that was created pursuant to the Reform Act, and statutorily charged with "approving and regulating private postsecondary educational institutions." Cal. Educ. Code § 94770. See also *id.*, § 94774 (detailing the Bureau's functions and responsibilities). Under § 94995, the Bureau is required to submit a written report to the legislature and the California Postsecondary Education Commission on or before January 31 of each calendar year "summarizing its activities during the previous fiscal year." *Id.*, § 94995(a). These annual reports must include, but are not limited to, the following:

"(1) Timely information relating to the enforcement activities of the bureau pursuant to this chapter.

(2) Statistics providing a composite picture of the private postsecondary educational community, including data on how many schools, as classified by subject matter, and how many students

protections for students such as enrollment and refund policies, disclosures regarding exam passage rates, transferability of credit, complaint investigation and mediation, and other disclosures that institutions are required to provide")).

43. *Id.*, Exh. 3 (SB 967).

44. See Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Request for Judicial Notice ("Pl.'s Opp. to Defs' RJN") (opposing judicial notice of Operation Monitor's 2005 Initial Report only); Pl.'s Opp. to Defs.' RJN 2 (opposing judicial notice of Bureau's 2004–2005 Annual Report only).

45. For the same reason, the court grants plaintiff's request for judicial notice.

46. See Pl.'s Opp. to Defs' RJN; Pl.'s Opp. to Defs.' RJN 2.

47. Pl.'s Opp. to Defs.' RJN at 2.

48. Pl.'s Opp. to Defs.' RJN 2 at 1.

there are within the scope of the activities of the bureau." *Id.*, § 94995(b).

The Reform Act requires that the Director of Consumer Affairs appoint a Bureau for Private Postsecondary and Vocational Education Operations and Administrative Monitor (the "Operations Monitor"). *Id.*, § 94779.2(a)(1). The Operations Monitor must "assess the Bureau's administrative operations, including its school approval, applicant review, revenue collection, and complaint and enforcement processes and procedures with the primary goals of improving the bureau's overall efficiency, improving its effectiveness, and improving its compliance with state laws, particularly with respect to the bureau's approval, complaint, and enforcement processes." *Id.*, § 94779.2(c)(1).[49] The Reform Act requires that the Operations Monitor submit "an initial written report of his or her findings and conclusions to the director, the bureau, and the Legislature no later than October 1, 2005, and every six months thereafter," and also "be available to make oral reports to each if requested to do so." *Id.*, § 94779.2(d). The Operations Monitor must "make his or her reports available to the public and the media" as well. *Id.*

As noted, under Rule 201(b)(2) of the Federal Rules of Evidence, the court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED.R.EVID. 201(b). The records and reports of administrative bodies are proper subjects of judicial notice, as long as their authenticity or accuracy is not disputed. See *Mack*, 798 F.2d at 1282 ("[A] court may take judicial notice of 'records and reports of administrative bodies' " (citation omitted)), overruled on other grounds, *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991); *Interstate Natural Gas Co. v. Southern Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir.1953) (same); *Lundquist v. Continental Casualty Co.*, 394 F.Supp.2d 1230, 1243 (C.D.Cal.2005) (" 'A court may take judicial notice of records and reports of administrative bodies,' such as notices and opinion letters issued by" an administrative agency (citation omitted)).

Because the Operation Monitor's 2005 Initial Report and the Bureau's 2004–2005 Annual Report are administrative re-

---

**49.** Paragraph (c)(2) provides further details about the Operations Monitor's responsibilities. See *id.*, § 94779.2(c)(2) ("This monitoring duty shall be on a continuing basis for a period of no more than two years from the date of the operations monitor's appointment and shall include, but not necessarily be limited to, all of the following:

(A) Assessing the bureau's revenue collections and needs, and its staffing.

(B) Evaluating the relevant laws and regulations to identify revisions that would improve state regulation and maintain or improve student and public protection.

(C) Improving the quality and consistency of the bureau's processes and performance, including complaint processing and investigation, and reducing timeframes for each.

(D) Reducing any complaint backlog.

(E) Ensuring consistency in the application of sanctions or discipline imposed on regulated institutions and persons.

(F) Improving the quality and timeliness of application and approval processes for regulated institutions and persons, the collection of fees, and the collection of information from, and the ability to disseminate information regarding, those entities or persons regulated by the bureau.

(G) Improving the bureau's ability to perform outreach to prospective students of private postsecondary and vocational educational institutions").

ports mandated by statute, and because Daghlian does not the *authenticity* of the reports, the court takes judicial notice of their content. The court does not take judicial notice of the Operation Monitor's and Bureau's opinions for their truth, however, since whether the consumer protection provisions of the Reform Act apply to non-WASC regionally accredited institutions is a fact in dispute in this action. See *Korematsu,* 584 F.Supp. at 1415 (finding it improper to take judicial notice of an agency's findings if "they are offered on the ultimate issue," since taking judicial notice the findings "would render them conclusive according to Rule 201(g)"). Nor does the court view the reports as constituting or reflecting the official position of the legislature. See CAL. EDUC. CODE § 94779.2(d) ("The operations monitor shall make every effort to provide the department and the bureau with an opportunity to reply to any facts, finding, issues, or conclusions in his or her reports with which the department or the bureau may disagree").

### b. Analysis

### i. Reform Act Provisions Concerning Non–WASC Regionally Accredited Institutions

"A non-WASC regionally accredited institution" is defined in the California Education Code as "a degree-granting institution that has been accredited by one of the non-WASC regional accrediting agencies listed in Section 94740.3." CAL. EDUC. CODE § 94740.5. DeVry has been accredited by The Higher Learning Commission of the North Central Association of Colleges and Schools, which is one of the approved non-WASC regional accrediting agencies identified in § 94740.3. See *id.,*

§ 94740.3(c).[50] Therefore, DeVry is a "non-WASC regionally accredited institution" within the meaning of the Education Code.

Article 8 of the Reform Act sets forth standards and evaluation procedures that degree-granting institutions must satisfy in order to obtain approval to operate in the state. See *id.,* § 94900 ("No private postsecondary educational institution may issue, confer, or award an academic or honorary degree unless the institution is approved by the [Bureau] to operate in California and award degrees"). Section 94900 describes the standards and procedures applicable to WASC-accredited institutions. To obtain approval under § 94901(c)(1), or conditional approval under § 94091(c)(2), the Bureau must determine that the WASC-accredited institution has met all of the following requirements:

"(1) The institution has the facilities, financial resources, administrative capabilities, faculty, and other necessary educational expertise and resources to ensure its capability of fulfilling the program or programs for enrolled students.

(2) The faculty are fully qualified to undertake the level of instruction that they are assigned and shall possess degrees or credentials appropriate to the degree program and level they teach and have demonstrated professional achievement in the major field or fields offered, in sufficient numbers to provide the educational services.

(3) The education services and curriculum clearly relate to the objectives of the proposed program or programs and offer students the opportunity for a quality education.

**50.** See Defs.' RJN, Exh. 1 (HLC Website). See also Defs. RJN 2, Exh. 2 ("Bureau Non–WASC Directory") (listing DeVry)).

(4) The facilities are appropriate for the defined educational objectives and are sufficient to ensure quality educational services to the students enrolled in the program or programs.

(5) The program of study for which the degree is granted provides the curriculum necessary to achieve its professed or claimed academic objective for higher education, and the institution requires a level of academic achievement appropriate to that degree.

(6) The institution provides adequate student advisement services, academic planning and curriculum development activities, research supervision for students enrolled in Ph.D. programs, and clinical supervision for students enrolled in various health profession programs.

(7) If the institution offers credit for prior experimental learning it may do so only after an evaluation by qualified faculty and only in disciplines within the institution's curricular offerings that are appropriate to the degree to be pursued. The council shall develop specific standards regarding the criteria for awarding credit for prior experimental learning at the graduate level, including the maximum number of hours for which credit may be awarded." *Id.,* § 94900(a).

Before approving a WASC-accredited institution for operation, the Bureau must conduct a comprehensive onsite review and assessment in all the areas identified in § 94900. See *id.,* § 94901(a)(1).

Non–WASC regionally accredited institutions must also obtain approval from the Bureau to operate in California. See *id.,* § 94905 ("Any non-WASC regionally accredited institution, as defined in Section 94740.5, that is incorporated in another state and maintains its accredited status

throughout the period of a student's course of study, *and that is approved by the bureau to operate,* may issue degrees, diplomas, or certificates" (emphasis added)). The approval process for such institutions is much less rigorous, however. To receive approval, a non-WASC regionally accredited institution must comply with five requirements:

"(1) The institution meets the financial responsibility requirements set forth in paragraph (2) of subdivision (a) of Section 94804.

(2) The institution's cohort default rate on guaranteed student loans does not exceed 15 percent for the three most recent years, as published by the United States Department of Education.

(3) The institution submits to the bureau copies of its most recent Integrated Postsecondary Education Data System Report of the United States Department of Education and its accumulated default rate.

(4) The institution pays fees in accordance with Section 94932.

(5) The institution has submitted an application to operate for itself or a branch or satellite campus pursuant to Section 94802 or an application for renewal pursuant to Section 94980." *Id.,* § 94905(b).

 Defendants contend that § 94905 clearly exempts non-WASC regionally accredited institutions from the consumer protection provisions contained in Article 6.[51] The court disagrees. The focus of § 94905 is the *approval* process for non-WASC regionally accredited institutions. The statute outlines the various requirements such an institution must satisfy to obtain the Bureau's approval to operate

---

51. Defs.' Reply at 8.

within the state.[52] It does not purport to be the *only* provision of the Reform Act applicable to non-WASC regionally accredited institutions, nor does not it expressly exempt these institutions from the requirements of Article 6. To the contrary, when the section is read as a whole, the only reasonable interpretation is that while the Legislature sought to streamline the approval process for non-WASC regionally accredited institutions, it did not intend to exempt them from the minimum standards set forth in Article 6, including §§ 94814, 94816, and 94832.

Paragraph 2 of subdivision (a), for example, states that "a non-WASC regionally accredited institution approved to operate pursuant to this section, and any and all of its programs offerings, are subject to the requirements of Article 13 (commencing with Section 94950)." *Id.,* § 94905(a)(2). As discussed, § 94985(a) of Article 13 makes unenforceable any contract or agreement arising from a transaction in which an institution willfully violated "any provision of Section 94800, 94810, 94814, or 94816, Sections 94820 to 94826, inclusive, Section 94829, 94831, or 94832." *Id.,* § 94985(a). If the Legislature had intended to exempt non-WASC regionally accredited institutions from complying with §§ 94814, 94816, and 94832, surely it would not have adopted § 94905(a)(2), which explicitly subjects such institutions "and any and all of [their] programs offerings" to the entirety of Article 13.

The inclusion of subdivision (e) in § 94905 also militates against defendants' proposed construction. That subdivision states: "A non-WASC regionally accredited institution approved to operate pursu-

ant to this section is exempt from the requirements of Sections 94900 and 94901, Article 9 (commencing with Section 94915), and Article 9.5 (commencing with Section 94931), except for the applicable financial responsibility requirements referenced by paragraph (2) of subdivision (a) of Section 94804." *Id.,* § 94905(e). Had the Legislature wanted to exempt non-WASC regionally accredited institutions from the requirements set forth in other articles, it would have done so in subdivision (e). The subdivision makes no mention of Article 6, however.

Defendants dispute this, citing § 94780, found in Article 5.[53] Section 94780 provides: "No institution, subject to this chapter, shall offer any educational service unless the institution is first approved by the council *and* meets all of the requirements in the following articles:

(a) This article, Article 6 (commencing with Section 94800) except as provided for institutions approved under Article 9.5 (commencing with Section 94931), Article 10 (commencing with Section 94932), Article 11 (commencing with Section 94940), and Article 12 (commencing with Section 94944).

(b) Article 8 (commencing with Section 94900), if the institution offers degrees.

(c) Article 9 (commencing with Section 94915), if the institution does not offer degrees.

(d) Article 9.5 (commencing with Section 94931), if the institution is registered pursuant to that article.

(e) Article 7 (commencing with Section 94850), if the educational pro-

---

**52.** See *id.* ("The plain language of *Education Code* section 94905 makes clear that Senate Bill 967 established an approval process for non-WASC regionally accredited institutions that was different from the approval process

applied to other institutions by *Education Code* section 97480").

**53.** Defs.' Reply at 5.

grams are not exempt under Section 94790." *Id.*, § 94780 (emphasis added).[54]

Section 94780 does not support defendants' position. First, it is clear that non-WASC regionally accredited institutions are "subject to this chapter" as that term is used in the statute. See *id.*, § 94739(a) (defining "private postsecondary education institutions" as "any person doing business in California that offers to provide or provides, for a tuition, fee, or other charge, any instruction, training, or education" under certain specified circumstances); *id.*, § 94739(b) (listing institutions that "are not considered to be private postsecondary educational institutions under this chapter"). As defendants concede, the section bars any institution that is subject to regulation under the Reform Act from offering educational services unless it is " 'first approved by the Council' and meets the requirements of various Titles of the Reform Act (including Title 6 commencing with 94800, which encompasses the Sections 94814, 94816, and 94832 of the *Education Code* at issue in this case)." [55] Nothing in § 94780, moreover, suggests that non-WASC regionally accredited institutions are exempt from this requirement or that they may offer educational services in California without complying with the requirements of Article 6. See *id.*, § 94780(b).

In short, under the plain language of the Reform Act, institutions like DeVry that are accredited by a non-WASC regional accrediting agency need not undergo the comprehensive review process the Bureau undertakes for WASC-accredited institutions, but must comply with the "General Standards For All Postsecondary Institutions Approved Under this Chapter" set forth in Article 6.

### ii. Purpose And Legislative History

The purpose and history of Senate Bill 967, which added § 94905 to the Reform Act in 2003, provide further support for this conclusion. See 2003 Cal. Legis. Serv. ch. 340 (S.B.967) (West). According to the report of the May 5, 2003 hearing before the Senate Committee on Business and Professions, the impetus for the bill was a November 2002 review of the Bureau's operations conducted by the Joint Legislative Sunset Review Committee ("JLSRC") and Department of Consumer Affairs. See Cal. Bill Analysis, S.B. 967 Senate Committee on Business and Professions (May 5, 2003). During that review, "[a] number of deficiencies and problems with the current regulation and administration of the Reform Act were presented to the JLSRC, and found in two audits that had been performed on the Bureau." *Id.* Specifically, the review revealed that the Bureau had a significant backlog in its approval of institutions, educational courses and instructors. See *id.*

S.B. 967 was sponsored by the Accredited Out-of-State Colleges and Universities in California ("AOCUC"). *Id.* The AOCUC argued that "the bill would streamline the regulatory process of the Bureau for regionally accredited degree granting institutions by relieving the Bureau from having to review those institutions or programs, *while maintaining the Bureau's complete regulatory authority over these same institutions for all consumer protection related provisions in the Reform Act.*" *Id.* (emphasis added); see *id.* ("The bill is intended, as a two-year pilot project, to remove degree granting private postsecondary colleges and universities from the institutional, program, and instructor approval requirements of the Re-

---

**54.** This section was added by A.B. 71, § 4.

**55.** Defs.' Reply at 5.

form Act administered by the Bureau—*but maintain the applicability of all the other regulatory and oversight provisions of the Reform Act—notably its provisions regarding fees, information reporting, participation in the Student Tuition Recovery Fund, student protections, and enforcement* " (emphasis added)).

Reports of subsequent hearings on the bill similarly show that, while the Legislature wanted to increase the Bureau's efficiency by allowing non-WASC regionally accredited institutions to undergo a relaxed approval process, it did not intend to exempt them from the student protection provisions of the Reform Act. See, e.g., Cal. Bill Analysis, S.B. 967 Assembly Committee on Business and Professions (July 1, 2003) ("Some claims have been made that this bill creates a competitive disadvantage for non-regionally accredited schools still subject to BBPVE regulation.... The purpose of this bill is not to level the playing field but instead to increase efficiencies and eliminate redundancies. Even with this bill, WASC schools will still theoretically have an advantage because this bill only calls for a partial deregulation"); Cal. Bill Analysis, S.B. 967 Assembly Committee on Higher Education (July 8, 2003) ("SB 967 is sponsored by the Accredited–Out–of–State Colleges and Universities in California (AOCUC). According to the sponsor, this bill would streamline the regulatory process at the BPPVE for regionally accredited degree granting institutions by relieving the BPPVE from having to review accredited degree granting institutions or programs, while maintaining the BPPVE's complete regulatory authority over these same institutions for all consumer related activities"); Cal. Bill Analysis, S.B. 967 Senate Floor, Third Reading (Aug. 18, 2003) ("This bill is sponsored by the Accredited Out–of–State Colleges and Universities in California (AOCUC). This bill

is intended, as a two-year pilot project, to remove degree granting private postsecondary colleges and universities from the institutional, program, and instructor approval requirements of the Reform Act administered by the Bureau. This bill maintains the applicability of all the other regulatory and oversight provisions of the Reform Act, notably its provisions regarding fees, information reporting, and participation in the Student Tuition Recovery Fund, student protections, and enforcement"). There is no suggestion in any of these reports that in enacting S.B. 967, the Legislature sought to provide a wholesale exemption for non-WASC regionally accredited institutions from the student protection provisions of Article 6.

### iii. Conclusion

Both the text and legislative history of the Reform Act support Daghlian's contention that, notwithstanding DeVry's status as a non-WASC regionally accredited institution, it must provide students with written notification regarding the transferability of credits, supply prospective students with a brochure or catalogue disclosing all material facts reasonably likely to affect their decision to enroll, and refrain from engaging in false and misleading advertising. See CAL. EDUC. CODE §§ 94814, 94816, 94832. Nonetheless, defendants urge the court to adopt the contrary position of the Operations Monitor and the Bureau.

It is well-settled under California law that " '[i]n determining the proper interpretation of a statute and the validity of an administrative regulation, the administrative agency's construction is entitled to great weight, and if there appears to be a reasonable basis for it, a court will not substitute its judgment for that of the administrative body.' " *Family Planning Assocs. Med. Group v. Belshe*, 62 Cal.

App.4th 999, 1004, 73 Cal.Rptr.2d 221 (1998) (quoting *Campbell Industries v. State Bd. of Equalization,* 167 Cal.App.3d 863, 868, 213 Cal.Rptr. 533 (1985) (internal citations and footnote omitted)). California courts have cautioned, however, that "[t]he ultimate interpretation of a statute is ... an exercise of judicial power and it is the responsibility of the courts to declare its true meaning even if it requires rejection of an earlier erroneous administrative interpretation.'" *Id.* at 1004, 213 Cal.Rptr. 533 (quoting *Wheeler v. Bd. of Administration,* 25 Cal.3d 600, 605, 159 Cal.Rptr. 336, 601 P.2d 568 (1979), and *Physicians & Surgeons Laboratories, Inc. v. Dep't. of Health Services,* 6 Cal.App.4th 968, 986, 8 Cal.Rptr.2d 565 (1992)).

Here, "the clear language and purpose of the statute" counsel rejection of the interpretation offered by the Operations Monitor and Bureau. The court notes in this regard that, while periodic reports by the Operations Monitor and the Bureau are mandated by statute, the reports do not constitute regulations or official agency findings, and do not have the force of law. See CAL. GOV'T. CODE § 11340.5(a). Accordingly, they are not entitled to the kind of deference normally accorded administrative interpretations. Compare *Family Planning Associates,* 62 Cal. App.4th at 1004, 73 Cal.Rptr.2d 221 (an "administrative agency's construction is entitled to great weight" when a court is determining the validity of an administrative regulation); *Campbell,* 167 Cal.App.3d at 868, 213 Cal.Rptr. 533 (stating that "an *administrative ruling* comes before the court with a presumption of correctness and regularity, which places the burden of demonstrating invalidity upon the assailant.... The ultimate resolution, however, of whether the Board has correctly interpreted *its own regulations* rests with the

courts" (citations and internal quotations omitted and emphasis added)); see also *Int'l Business Machines v. State Bd. of Equalization,* 26 Cal.3d 923, 930–31, 163 Cal.Rptr. 782, 609 P.2d 1 (1980) ("The Board has embodied its interpretation of section 6006.3, *in an administrative regulation.* That regulation, a contemporary administrative construction of a statute by the agency charged with its enforcement and interpretation, 'is entitled to great weight unless it is clearly erroneous or unauthorized'" (citations and footnotes omitted; emphasis added)).

In sum, based on the text and legislative history of the Reform Act, the court concludes that DeVry is subject to the student protection provisions of Education Code §§ 94814, 94816, 94832. Defendants' motion to dismiss Daghlian's first cause of action is therefore denied.

## C. Second Cause Of Action For Violation Of The Consumer Legal Remedies Act

Daghlian's second cause of action asserts a claim for violation of § 1770(a)(5) of the Consumer Legal Remedies Act (the "CLRA"). Daghlian contends that he and other members of the putative class are consumers within the meaning of the CLRA, because they purchased goods and services intended for sale by defendants.[56] Daghlian alleges that "[b]y advertising to prospective students that the school's credits are easily transfer[r]able to other schools, and [by] failing to adequately disclose information required by the Education Code, defendants misrepresented their services as having characteristics, benefits, or qualities which they do not have, all of which are prohibited acts under

---

**56.** First Amended Complaint, ¶ 31.

§ 1770(a)(5) of the [CLRA]."[57] Daghlian contends that as a proximate result of the misrepresentations, he and other class members suffered monetary damage in the form of tuition payments and attendance costs.[58] Daghlian seeks an order enjoining further violations of the CLRA, as well as other appropriate relief, under Civil Code §§ 1780(a) and 1782(d).[59]

Defendants assert that the CLRA claim must be dismissed as untimely.[60] They argue that a § 1770(a)(5) claim must "be commenced not more than three years from the date of the commission of such method, act, or practice." Cal. Civ. Code § 1783. Because Daghlian's CLRA claim challenges advertising that allegedly induced him to enroll with DeVry in April 2001, and because Daghlian did not file this action until December 2005, defendants assert that the CLRA claim is time-barred.[61] In his opposition, Daghlian concedes that "his Consumer Legal Remedies Act claim may be time-barred and ... withdraws th[e] cause of action."[62] Because Daghlian has withdrawn the CLRA claim, the court dismisses it with prejudice.

### D. Third And Fourth Causes Of Action For Violations Of California Business And Professions Code §§ 17500, Et Seq. And §§ 17200, Et Seq.

Daghlian's third and fourth causes of action allege that defendants engaged in false advertising in violation of California Business and Professions Code §§ 17500, et seq., and in unlawful, unfair, and deceptive business practices in violation of California Business and Professions Code §§ 17200, et seq.

California Business and Professions Code §§ 17500 et seq. prohibit the dissemination of false or misleading statements in connection with advertising. Cal. Bus. & Prof. Code § 17500.[63] "Section 17500 has been broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although true, is ei-

57. *Id.*, ¶ 32.

58. *Id.*, ¶¶ 33, 34.

59. *Id.*, ¶ 35.

60. Defs.' Mot. at 8.

61. *Id.*

62. Pl.'s Opp. at 1 n. 2.

63. The full text of section 17500 reads: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine." Cal. Bus & Prof. Code § 17500.

ther actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 679, 38 Cal.Rptr.3d 36 (2006) (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002) (internal quotation marks omitted)). A court may award injunctive relief and restitution for false advertising that violates § 17500. See *id.*, § 17535.

Under California Business and Professions Code §§ 17200 et seq., any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." *Id.*, §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair deceptive, untrue or misleading advertising." *Id.*, § 17200. The Supreme Court has construed the term broadly. See *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) ("[Section 17200] defines 'unfair competition to include any unlawful, unfair or fraudulent business act or practice.... Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.... By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.... However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice ... makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair,

or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal.App.4th 659, 676–77, 43 Cal. Rptr.3d 148 (2006) ("The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. [Citation.]' Thus, the scope of the UCL (Bus. & Prof.Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)). A violation of the false advertising law, §§ 17500 et seq., constitutes a violation of the unfair competition law, §§ 17200 et seq. *Pfizer Inc. v. Superior Court*, 45 Cal.Rptr.3d 840, 843 (Cal.App.2006) (citing *Kasky*, 27 Cal.4th at 949–50, 119 Cal. Rptr.2d 296, 45 P.3d 243)).

On November 2, 2004, California voters passed Proposition 64; it took effect the following day, in accordance with Article II, Section 10 of the California Constitution. *Lyons v. Chinese Hosp. Ass'n*, 136 Cal.App.4th 1331, 1336 n. 2, 39 Cal.Rptr.3d 550 (2006); see also *R & B Auto Ctr., Inc. v. Farmers Group, Inc.*, 140 Cal.App.4th 327, 44 Cal.Rptr.3d 426, 453 (2006). Proposition 64 amended the California Business and Professions Code to bar persons from suing as "private attorneys general" or on behalf of others absent a showing that they themselves had suffered injury as a result of the allegedly unfair business practice. See CAL. BUS. & PROF. CODE § 17535 ("Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section..."); *id.*, § 17204 ("Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney ... or upon the complaint of any board, officer, person, corporation or association or by *any person who has suffered injury in fact and has lost money or*

*property as a result of such unfair competition* " (emphasis added)). See also *Paulus,* 139 Cal.App.4th at 677 n. 13, 43 Cal. Rptr.3d 148 ("California's electorate narrowed the scope of the UCL in 2004 by passing Proposition 64.... Proposition 64's provisions included—by amendment to Business and Professions Code section 17204—the elimination of the right of a person 'acting for the interests of itself, its members or the general public' to bring a UCL suit, changing the language of the statute to read that a person could bring suit only if the person 'has suffered injury in fact and has lost money or property as a result of such unfair competition.' (Ballot Pamp., Gen. Elec. (Nov. 2, 2004) text of Prop. 64, § 3, p. 109)"); *Harris v. Investor's Business Daily, Inc.,* 138 Cal.App.4th 28, 33, 41 Cal.Rptr.3d 108 (2006) (California Business and Professions Code § 17203 "now requires that relief may be sought only by persons who have themselves suffered injury"); *Feitelberg v. Credit Suisse First Boston, LLC,* 134 Cal. App.4th 997, 1010, 36 Cal.Rptr.3d 592 (2005) (Proposition 64 amendments "limit private representative actions to persons who ... meet the standing requirements set forth in section 17204, which include injury in fact").

Additionally, § 17200 plaintiffs must now satisfy the requirements for class actions under California law. See CAL. BUS. & PROF. CODE § 17535 ("Any person may pursue representative claims or relief on behalf of others only if the claimant ... complies with Section 382 of the Code of Civil Procedure," which governs class actions); *id.,* § 17203 (same). See also *Harris,* 138 Cal.App.4th at 33, 41 Cal.Rptr.3d

108 (a representative claim for unfair competition "requires class certification under the Code of Civil Procedure section 382"); *Schwartz v. Visa Int'l Serv. Ass'n,* 132 Cal.App.4th 1452, 1458, 34 Cal.Rptr.3d 449 (2005) ("[T]he UCL now authorizes a person to pursue a representative action only if he or she meets the class certification requirements of section 382 of the Code of Civil Procedure").

Defendants argue that Daghlian's § 17500 and § 17200 claims must be dismissed because he has not established that he has standing to prosecute the claims as required by Proposition 64.[64] Defendants emphasize that "nowhere in the FAC does [Daghlian] allege that he actually attempted to transfer to another school that refused to accept his DeVry units, thus forcing him to repeat courses or incur additional tuition expenses." [65] In the absence of such an allegation, defendants assert, Daghlian has failed to show that he suffered the type of "injury in fact" necessary to maintain the third and fourth causes of action.[66]

Daghlian counters that he has adequately pled injury in fact.[67] He argues that he suffered injury when he "spent tens of thousands of dollars in tuition expecting that his degree would be a foundation for further education" and "did not receive what he had bargained for." [68] He contends that regardless of his future actions, he has standing to maintain the §§ 17500 and 17200 claims.[69]

The first amended complaint alleges that Daghlian attended DeVry from April

---

64. Defs.' Mot. at 10.

65. *Id.* at 10–11.

66. *Id.* at 11.

67. Pl.'s Opp. at 22.

68. *Id.*

69. *Id.*

2002 to October 2005.[70] Daghlian asserts that prior to enrolling at DeVry, he met with a DeVry recruiter, who told him that DeVry "offered academic credits that would be transferable to a wide variety of other academic institutions." [71] He alleges that he did not receive documents disclosing that his DeVry credits would likely not transfer to other colleges.[72]

■ Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt "[i]n reliance on" [73] defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices. See *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13, 38 Cal. Rptr.3d 653 (2005) (stating that after Proposition 64, "any person who has suffered injury in fact and *has lost money or property as a result of such unfair competition*" can bring a UCL cause of action). The fact that Daghlian may have received some value from his $40,000 in tuition payments does not mean that he suffered no injury. See, e.g., *Pfizer Inc.*, 45 Cal. Rptr.3d at 852 (assuming, in a post-Proposition 64 case, that the class plaintiff had standing to sue under § 17500 and § 17200 because he alleged that he *purchased* Listerine in reliance on Pfizer's purportedly false and misleading label; "[T]o have suffered an injury in fact as a result of the alleged misrepresentation, a plaintiff would have had to read Pfizer's label 'as effective as floss against plaque and gingivitis' or some similar statement and relied thereon in buying Listerine. A consumer who was unaware of, or who did not rely upon, Pfizer's claims comparing Listerine to floss did not suffer any 'injury in fact' as a result of the alleged fraudulent business practice or false advertising"); see also *Laster v. T–Mobile USA, Inc.*, 407 F.Supp.2d 1181, 1194 (S.D.Cal.2005) ("[A]fter Proposition 64, a person seeking to represent claims on behalf of others must show that (1) she has suffered actual injury in fact, and (2) such injury occurred as a result of the defendant's alleged unfair competition or false advertising.... With respect to the first prong—injury in fact—Plaintiffs claim they entered into a bundled transaction with Defendants whereby they purchased both a phone and cellular service, and in doing so, were provided with a phone that was falsely advertised as 'free' or substantially discounted, when in fact, they were required to pay the sales tax on the full retail value. Plaintiffs, in essence, contend putative class members were injured by Defendants' 'bait-and-switch' practices; that is, consumers were lured in with advertisements for free or deeply discounted phones, yet once in the store, they were charged sales tax based on the full retail value of the phone.... Such allegations sufficiently allege an injury in fact"). As in *Pfizer*, where the Listerine user had standing to sue despite the fact that he obtained some, albeit not the advertised, benefit from using the product, Daghlian has standing to sue despite the fact that he may have received some, albeit not the advertised, benefit from taking classes at DeVry. Therefore, Proposition 64 does not bar Daghlian's third and fourth causes of action.

**70.** First Amended Complaint, ¶ 4.

**71.** *Id.*

**72.** *Id.*

**73.** *Id.*

## III. CONCLUSION

For the reasons stated, defendants' motion is granted in part and denied in part. The court dismisses plaintiff's second cause of action for violation of the CLRA with prejudice. It denies defendants' motion in all other respects.